LILLIE A. MAISCH *vs.* CHARLES O. MAISCH.

Third Judicial District, New Haven, June Term, 1913.

PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

Contracts made for the purpose of facilitating divorce are everywhere held to be contrary to public policy; but a bona fide non-collusive agreement respecting the amount of alimony to be paid in case a decree of divorce should be granted in an action then pending, if valid where made, is not so contrary to the public policy of this State as to be unenforceable in our courts, even though it might have been held otherwise had the contract been made in this jurisdiction.

In an action upon such a contract, to recover the stipulated alimony, the defendant alleged that the contract was against public policy and void, but no issue was raised as to the validity of the decree of divorce. *Held* that under these pleadings evidence that the parties had agreed to live apart and were so living when the decree was obtained, and that the plaintiff had testified falsely in the divorce suit, was properly excluded as irrelevant.

Courts are generally loath to deny the enforcement of a contract which is valid where made, and will only do so where the domestic policy imperatively requires it.

The case of *Seeley's Appeal*, 56 Conn. 202, explained and distinguished.

Argued June 12th—decided July 25th, 1913.

ACTION upon a contract for the future support and maintenance of the plaintiff in lieu of permanent alimony, in case a divorce should be granted, brought to the Superior Court in New Haven County where a

demurrer to the complaint was overruled (*Gager, J.*) and the cause was afterward tried to the court, *Williams, J.;* facts found and judgment rendered for the plaintiff for $3,573, and appeal by the defendant. *No error.*

The plaintiff and her then husband, the defendant, while resident in South Dakota, there entered into a contract reciting that the plaintiff had commenced an action for divorce in a South Dakota court; that the defendant had appeared and answered; that it was desirable to settle their property affairs and rights independently of the divorce proceedings, and to agree upon the amounts to be allowed the plaintiff as attorney's fees, costs, and alimony rather than to submit these matters to the court for adjudication, leaving to the court the question only of whether the plaintiff was entitled to an absolute divorce. The contract then provided for the payment of agreed allowances and costs and of $20 a week, in the event of a decree of divorce being granted, during the defendant's life and until the death or marriage of the plaintiff. After the execution of the contract and on the same day a decree of absolute divorce was granted to the plaintiff. Plaintiff has not remarried, and brings this action to recover damages for the defendant's neglect and refusal to make the payments required by the agreement. A demurrer to the complaint on the ground that the contract was against public policy and void was overruled (*Gager, J.*), and the defendant answered denying that anything was due under the contract, and in a second defense again setting up that the contract was against public policy and void. It was not pleaded that the divorce proceedings were in fact collusive or fraudulent.

*Nichols C. Downs* and *Daniel F. B. Hickey,* for the appellant (defendant).

*Leonard M. Daggett,* for the appellee (plaintiff).

Maisch *v.* Maisch.

BEACH, J.  The principal question is whether the contract sued on is, on its face, and without a showing that it was in fact intended or used for collusion or suppression of evidence, so contrary to the public policy of Connecticut that it cannot support the judgment.

It is everywhere agreed that contracts for the purpose of facilitating divorce are contrary to public policy, as where the agreement is to assist each other in obtaining the divorce; *Palmer* v. *Palmer*, 26 Utah, 31, 72 Pac. 3; or for the nonappearance of one of the parties, as in *Belden* v. *Munger*, 5 Minn. 211 (Gil. 169), *Adams* v. *Adams*, 25 Minn. 72; or where money is paid in consideration of the agreement of the wife to prosecute and sue for divorce, as in *Kistler* v. *Kistler*, 141 Wis. 491, 124 N. W. 1028.

But there is a difference of opinion as to the validity of contracts made after divorce proceedings have been independently commenced or determined upon, and where the agreement is in fact an amicable arrangement as to the amount of alimony to be paid in the event of a divorce being granted.  In some jurisdictions contracts of this general character are permitted, and even favored.  *Burnett* v. *Paine*, 62 Me. 122; *Badger* v. *Hatch*, 71 Me. 562; *Snow* v. *Gould*, 74 Me. 540; *Warren* v. *Warren*, 116 Minn. 458, 133 N. W. 1009; *Randall* v. *Randall*, 37 Mich. 563; *Palmer* v. *Fagerlin*, 163 Mich. 345, 128 N. W. 207; *Pryor* v. *Pryor*, 88 Ark. 302, 114 S. W. 700.  In other jurisdictions such contracts are held to be contrary to public policy.  *Lake* v. *Lake*, 136 N. Y. App. Div. 47, 119 N. Y. Supp. 686; *Speck* v. *Dausman*, 7 Mo. App. 165; *Muckenburg* v. *Holler*, 29 Ind. 139; *Hamilton* v. *Hamilton*, 89 Ill. 349; *Seeley's Appeal*, 56 Conn. 202, 14 Atl. 291.

According to the law of South Dakota, the contract in suit appears to be valid.  By that law husband and

wife may contract with each other respecting property, and they may agree in writing to an immediate separation. Code, §§ 98 and 99. In *Burgess* v. *Burgess*, 17 S. D. 44, 95 N. W. 279, a woman, after divorce, sued her former husband for specific performance of a contract to convey real property, made in contemplation of the divorce proceedings, in lieu of alimony. The court said (p. 50): "The law of this State expressly permits contracts between husband and wife with respect to the property of each, but forbids certain agreements, as collusive, which are intended to alter or promote the dissolution of the relation of husband and wife. Contracts relating to alimony are being constantly made and enforced, while agreements which contravene the policy of the law in relation to granting divorces are everywhere regarded as illegal. . . . The plaintiff was not asked to commit, or to appear to have committed, or to be represented in court as having committed, any act constituting a cause for divorce. She was not asked to refrain from appearing in the contemplated action for divorce, nor does it appear that she ever agreed to refrain from making a defense. It is true that she did not appear, relying . . . on the defendant's express promise, and was thus deprived of an opportunity to have her property rights and the property rights of her daughter determined by the court. But it does not affirmatively appear, and we think it cannot be inferred, that she made any agreement as a consideration of receiving the land, which, if shown, would have required the court to deny her husband a divorce on the ground of collusion."

Such being the law of South Dakota, the contract was valid at the time and place it was made, and gave rise to an enforceable obligation. That being so, the obligation is enforceable here, unless its enforcement

would contravene some important public policy of the State or the canons of morality established by civilized society. Minor on Conflict of Laws, p. 9.

That the contract was not contrary to any universally accepted code of morals is evident from the difference of opinion above pointed out. In determining whether foreign created rights, valid at the place of their origin, will or will not be enforced in another jurisdiction when contrary to some domestic public policy of the forum, the courts are compelled, in the absence of statutory direction, to weigh the injustice of refusing the remedy against the importance of maintaining the domestic policy. "In deciding cases of this kind, therefore, each court has to pass upon the importance of the domestic policy maintained by its laws. They are generally loath to deny the enforcement of a proper foreign law, and will not, if they consider the domestic policy of minor importance. But where it is a fundamental and important policy of a State, established after careful consideration of the supposed needs and wants of its people, no foreign law will be permitted to supersede it." Minor on Conflict of Laws, p. 11. "Not every common-law or statutory rule prevailing at the forum involves a distinctive policy in the sense of the exception." 1 Wharton on Conflict of Laws (3d Ed.) § 4a; *Medway* v. *Needham*, 16 Mass. 157; *Milliken* v. *Pratt*, 125 Mass. 374; *McKee* v. *Jones*, 67 Miss. 405, 7 So. 348; *Egbert* v. *Baker*, 58 Conn. 319, 20 Atl. 466; *First Nat. Bank* v. *Walker*, 61 Conn. 154, 23 Atl. 696.

No unyielding principle can be invoked, but each case must be determined as a matter of comparative justice. In the present case the contract has been fully performed by the plaintiff; in reliance on the defendant's express agreement, valid where made, she has omitted to demand alimony from the court and has now lost her opportunity of doing so; there is no showing that

the contract was actually made for the purpose of collusion or suppression of evidence, and no claim that the decree is for any reason invalid; so that nothing remains unperformed except a financial obligation which the defendant seeks to evade. The public policy of Connecticut is not invoked to prevent the doing or continuance of any act forbidden by our law, but as a token of our disapproval of a past transaction in South Dakota between residents of that State which was unobjectionable under their law; a disapproval, moreover, founded on a general objection to the making of such contracts and not upon any special objection to this particular transaction.

We think it clear that the State of Connecticut is not deeply concerned as a matter of public policy in reprehending this contract. The right of each State to determine as a matter of public policy the conditions upon which the marital relations of its citizens may be dissolved is fully recognized; and it would seem that the same policy ought to control the validity of contracts made in view of pending divorce proceedings. It is no part of the public policy of Connecticut to be more careful than the State of Dakota itself in protecting the divorce courts of Dakota against collusion.

We have assumed that the policy of the State of Connecticut is opposed to contracts between husband and wife made after divorce proceedings have been instituted and with a view to fixing by mutual agreement the amounts to be paid by the husband in lieu of alimony. It may be doubted, perhaps, whether the case of *Seeley's Appeal*, 56 Conn. 202, 14 Atl. 291, goes quite to this length, for that decision is complicated by the fact that the wife was at the time of the contract legally incapable of contracting with her husband. It is also pointed out in *Seeley's Appeal*, 56 Conn. 202,

14 Atl. 291, that the contract in that case was objectionable because the court was left to rest a decree upon evidence which did not include all the facts in the case. This objection goes to the root of the matter. Such contracts, when made not to facilitate divorce but solely as an amicable settlement of property affairs, and made in view of divorce proceedings already independently instituted or determined upon, are not necessarily contrary to public policy and void, unless concealed from the court. If submitted to and approved by the court with full opportunity for scrutiny before the decree, they are unobjectionable; but, if concealed from the court, they are contrary to public policy and will not be enforced unless in extreme cases where the refusal to do so would assist in the perpetration of an intentional fraud.

It does not appear whether the contract here in question was or was not concealed from the South Dakota court; but, as it was valid, there can be no presumption of any motive for concealing it. On the whole record, the contract is not so violative of the public policy of this State as to prevent a recovery.

On the trial of the action the defendant introduced in evidence articles of separation made in New York between the plaintiff and the defendant in July, 1902, expressing the fact that the plaintiff and the defendant had agreed to live separate and apart. The defendant then offered in evidence a certified copy of all the proceedings in the South Dakota divorce suit for the purpose of showing that the plaintiff had testified before the South Dakota court in such proceedings that she had been deserted by the defendant. The evidence was claimed in support of the allegations of the second defense. The defendant also called the plaintiff as a witness and inquired whether she had testified in the divorce suit in South Dakota that her husband had

deserted her and whether his living apart had been contrary to her wish and desire.

All this evidence was objected to, and excluded on the ground that the second defense contained no allegation of fact, and that the evidence was not relevant to any issue in the cause. Upon an examination of the pleadings, we think the evidence was properly excluded.

There is no error.

In this opinion the other judges concurred, except WHEELER, J., who dissented.